BRYAN DUANE PANKEY and
JO ANN PANKEY,

                    Debtors,

_____/

GENE R. KOHUT,                                          Case Number 07-13256
                                                        Bankr. Number 05-67427
                    Appellant,                          Honorable David M. Lawson

v.

NEW CENTURY MORTGAGE CORP. and
WELLS FARGO BANK, N.A.,

                    Appellee.

_____/

## OPINION

The bankruptcy trustee appeals the decision of the bankruptcy court granting summary

judgment to creditors Wells Fargo Bank, N.A. and New Century Mortgage Corporation, determining

as a matter of law that a mortgage on the debtor's property was perfected more than ninety days

before the bankruptcy filing, and therefore did not constitute a preferential transfer within the

meaning of 11 U.S.C. § 547(b)(4)(A).  The critical and determinative issue is the date on which the

mortgage can be deemed "recorded" under Michigan law, which in turn establishes the date on

which the creditor's security interest was perfected in this case and therefore the transfer date of the

property interest in question.  The Court finds that an instrument is "recorded" by a county register

of deeds when the person who seeks the benefit of the recording laws completes all the legal

requirements for recording such an instrument, even when county officials are unfaithful to their

statutory duties.  Because fact issues preclude a determination as to when those requirements were

completed in this case, the Court finds that summary judgment was improper. Therefore, the Court will reverse the judgment of the bankruptcy court and remand the case for further proceedings.

I.

The parties are in substantial agreement as to the basic facts and the underlying legal framework in which this dispute is presented. On February 11, 2005, debtors Bryan and Jo Ann Pankey refinanced their home located in Clarkston, Michigan, with two loans from New Century Mortgage Corporation. Each loan was memorialized by a separate promissory note, and each was secured by a mortgage. Only the first of these notes, for $192,000, is at issue in this case. As security for the loan, the debtors granted New Century a first mortgage against their residential property. The funds were disbursed on February 16, 2005, and shortly thereafter, on February 22, 2005, New Century assigned the mortgage to Wells Fargo. Progressive Title Insurance Agency, Inc. handled the closing of the loan transaction and subsequent recording of the mortgage.

The title company presented the mortgage in recordable form to the Oakland County Register of Deeds on March 24, 2005. A check for the recording fee was written either on that date or on March 28, 2005. However, the mortgage was not assigned a liber and page until June 20, 2005, and the recording fee check was not deposited by the county until June 22, 2005.

On August 26, 2005, the debtors filed a petition for bankruptcy under Chapter 7 of the Bankruptcy Code. Adversarial proceedings were commenced by the trustee Kohut in October 2006 to avoid the mortgage pursuant to 11 U.S.C. § 547(b) as a preferential transfer. Of course, the bankruptcy trustee may avoid transfers by the debtor that occur within ninety days before the debtors' bankruptcy filing. 11 U.S.C. § 547(b)(4)(A). A transfer includes a conveyance of any interest in property, including a security interest. 11 U.S.C. § 101(54). A mortgage constitutes such

a conveyance.  *In re Van Duzer*, 390 Mich. 571, 577, 213 N.W.2d 167, 170 (1973).  The Bankruptcy Code states that a transfer is made "at the time such transfer is perfected."  11 U.S.C. § 547(e)(2)(B).[1]  In the case of real property, "perfection" of a security interest occurs "when a bona fide purchaser of such property from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest that is superior to the interest of the transferee."  11 U.S.C. § 547(e)(1)(A). Under Michigan law, a good faith purchaser cannot acquire such a superior interest in real estate after the transferee's conveyance is "duly recorded."  Mich. Comp. Laws § 565.29.  So for the purpose of the preference statute, a transfer of an interest in real estate occurs on the date the interest is recorded under state law.  If the creditor's mortgage in this case is deemed to have been recorded after May 27, 2005 – that is, within ninety days from the bankruptcy filing – the trustee may set it aside as a preference.

All of this demonstrates the importance of establishing with certainty the date an instrument affecting real estate is deemed "recorded."  That point was fully embraced long ago by the Michigan legislature when it prescribed specific rules governing county registers of deeds and the recording of instruments.  For instance, the law requires "[e]very register of deeds [to] keep an entry book of . . . mortgages" noting the "date of receipt, month, day, [and] hour" the documents are received by the register of deeds for recording.  Mich. Comp. Laws § 565.24.  When a mortgage fit for recording is presented to a county register of deeds, "[i]n the entry book of mortgages the register *shall* enter all mortgages."  Mich. Comp. Laws § 565.25(1) (emphasis added).  For over a century, under

---

[1]Under the 2005 version of the Code, the formal date of transfer also could relate back to the actual date of conveyance if perfection had occurred within ten days of that date.  11 U.S.C. § 547(e)(2)(A) (2005).  Subsequent amendments have expanded that period to thirty days.  There is no argument here that the transfer in this case relates back to the conveyance date of February 11, 2005.

Michigan law "[t]he instrument shall be considered as recorded at the time so noted" in the book. Mich. Comp. Laws § 565.25(4); *see also Balen v. Mercier*, 75 Mich. 42, 48, 42 N.W. 666, 668-69 (1889) (holding that "[o]ur statutes contemplate that any instrument which is entitled to be recorded shall first be entered by the register in the entry book, and it is then deemed recorded").

One might assume, then, that the recording date of the mortgage in this case would be quickly ascertained by consulting Oakland County's mortgage entry book. But the answer to the question, "when was the mortgage in this case recorded?" has been complicated by the failure of the Oakland County Register of Deeds, Ruth Johnson, to maintain a mortgage entry book, in defiance of state law. This problem apparently exists in other Michigan counties as well, *see In re Schimiel,* 362 B.R. 802, 808-09 (Bankr. E.D. Mich. 2007), and it prompted the bankruptcy court in another case to certify to the Michigan Supreme Court the question when a mortgage is deemed recorded where a county register of deeds shirks her legal duty to keep a mortgage entry book. Although commercial certainty and predictability would have been enhanced by a definitive answer to that question under state law, the state supreme court refused to furnish one. *In re Certified Question from the U.S. Bankr. Ct. for the E. Dist. of Mich.*, 477 Mich. 1210, 722 N.W.2d 423 (2006).

In the absence of a bright-line indicator of the recording date in this case, the parties sought to discover the facts surrounding the presentation of the Pankey mortgage to county officials. The record shows that the mortgage was delivered to the Oakland County register of deeds on March 24, 2005 by a title company employee, and it was stamped "received" on that date. Def.'s Mot. for Summ. J., Ex. D, Thierbach Dep. at 13. The mortgage was not delivered by itself, but rather arrived with a "batch" of twenty-three other documents. The chief deputy register of deeds, Laura Thierbach, testified that the mortgage was in recordable form on the date it was received. However,

because it was submitted by a title company and arrived with a "batch" of other mortgages, the mortgage was subject to a different, slower process for actual recording. Although Thierbach testified that the procedure was followed for several years beforehand, *see* Thierbach Dep. at 8, the policy at issue was not set down in writing until May 5, 2005. In a memo addressed to "all title companies," The Oakland County Register of Deeds explained as follows:

> Because Oakland County deals with a large number of title companies daily, the Register of Deeds Office has established a specific procedure we ask all title companies to follow. If the procedures change, you will be notified in writing.

> Documents recorded by companies are divided into two categories, large and small, and there is a different procedure for each. Small groups of documents (50 documents or less) should follow the following procedure:

> **<u>Small Recordings</u>** - Drop the documents off in a folder with the title company name on it in the wire basket to the Validation department to have the legal descriptions verified. The parcel ID number must be shown on each document. The Register of Deeds Staff is not allowed to change numbers or put numbers on the documents. If there is an error on a document, the Validation unit will put a blue post[-]it note on the top of the document telling you what the problem is. After the Validation department is done with the folder, the Real Estate unit will check each document for errors and/or omissions. If there is a problem with a document, the real estate unit will put a yellow post[-]it note at the top of the document telling you what the problem is.

> **Once all the documents are ready to record with all corrections made, take any document that has had a correction made to the appropriate department for the initials of the company to be put on. Run two adding machine tapes showing the total of the recording package.

> **Organize the documents in the folder with deeds first, then put the rest of the documents in smallest to largest page count order, with the exception of first and second mortgages. It is the responsibility of the Title Company to have all documents in the order they want them recorded.

> **Leave the folder of documents along with the two adding machine tapes and your blank check in the small title recording basket. These documents will be recorded the next morning. You can come back later that day or the next day to pick up your empty folder and receipt.

**Large Recordings** - Groups of documents up to 300 per day.  Documents should again be submitted to the Validation unit following the same procedure above.  Once the Real Estate unit has completed checking the documents they will return the folder to the filing cabinet located in the front of the office.  Title companies should pick up their folders, make **all** corrections and then take the documents back to the appropriate department for title company initials to be put on all documents.

**Once all the documents are ready to record with **all** corrections made, run two adding machine tapes showing the total of the recording package.  If you are recording the limit of 300 document [sic], divide your documents into groups of 100's [sic] or less and total each group.  Organize the documents with deeds first then all other documents in order of smallest to largest page count order, with the exception of first and second mortgages.  Once you have recorded a group of 100 documents, you will need to sign up again to record the others.  You need to have a separate check for each group.

**Sign up on the cashier recording list.  The documents are recorded in the order the companies have signed up.  It is the responsibility of the company representative to watch the sign up list so that you will be present for your turn.  There is a ten-minute waiting period between companies.  If you do not go to the register to record within the [sic] ten minutes, you will be skipped.  (We do not wait 10 minutes per Title Company).

Pls.'s Objs. to Mot. for Summ. J., Ex. 3, The Oakland County Register of Deeds Memo.

Thierbach testified that the Oakland County register of deeds had a unique policy that applied when title companies delivered mortgages, which is described in the memo.  When, as here, the title company sought to record fifty documents or fewer, the title company was required to leave the documents in a folder at the register of reeds office for review and validation.  Documents were validated in the order of their receipt, first by the "validation unit" and then by the "real estate unit."  Workers in the validation unit would stamp the mortgages "received" on the date they arrived and would then "check the legal descriptions shown on each document."  Thierbach Dep. at 5.  If the mortgage passed inspection at that level, personnel in the real estate unit would take over "and check each document for state requirements such as signatures, notaries, [and] dates."  *Id.* at 6.  When the real estate unit was finished, the mortgages would be placed in a filing cabinet where the title

company could pick them up and make corrections if needed or, if not, take them directly to the cashier's department for payment of the filing fee. As Thierbach explained, that process placed quite a bit of responsibility on the title company and, strangely, required submission of a blank check:

> When those ladies [in the real estate unit] are done, we have a filing cabinet that the entire folder is put in. Then the title company, it's their responsibility to come back, pick up their documents. If they have any corrections that need to be made either to the legal description or if a signature is missing or something like that, it's their responsibility to have those corrections made. . . . And take them back to the appropriate department to have the final check put on it so that we all know that everything is right with that document and get them to the cashier. If they have less than 50 documents, they can run – we ask them to run two adding machine tapes to total up – to show what their total is. And we ask them to do it twice just so we're sure that they have the correct total. They can then take those documents, put a blank check in the folder with the documents. We have a basket that goes right to our cashiers. And they are put on record the next morning. . . . So if they're leaving it blank, then the cashiers would fill in the amount as long as they match the adding machine tapes that the title company has come up with a total for.

*Id.* at 6-7. *See also id.* at 19-21 Again, although the memo was not distributed until May 2005, the Oakland County register of deeds apparently had followed the practice set forth therein "for years and years," since 2000 or 2001. *Id.* at 8. Notably, the process does not include making any entries in the mortgage entry book, as the statute requires.

Examining the mortgage document at issue in this case, Thierbach testified that "it was in recordable form" when it was received on March 24, 2005. *Id.* at 13. However, she noted that it was not assigned a liber and page number until June 20, 2005, which she deemed the "recorded date." *Id.* at 14. She knew the document was in recordable form on the day of receipt because if there had been problems, there would have been a post-it note attached and, following corrections, an additional "received" stamp. *Id.* at 13-14, 18. When asked why there was a roughly three-month gap between the date of receipt and the recorded date, Theirbach could only speculate:

> I believe that it's because the title company representatives did not come back and pick up the documents in a timely amount of time. Maybe they did. Maybe they came back the very next day and picked them up and for whatever reason they weren't recorded until June 20th. I have no way of knowing that.

*Id.* at 14. Michigan law requires that the register of deeds must record "the date, hour, and minute of receipt . . . in the order in which the instruments respectively are received." Mich. Comp. Laws § 565.25(1). Theirbach testified, however, that the Oakland County register of deeds's entry book for mortgages lists the date that a mortgage was finally recorded (i.e., when the filing fee was processed and the documents were assigned a liber and page), not the date it was received. *See id.* at 18-19.

Additionally, Theirbach discussed the payment process. She described two basic options that are available to a title company to submit the necessary fee. The usual method, mentioned above, involved placing a blank check with the mortgage and an adding machine tape into a bin in front of the cashier's window. When this method was chosen, the cashiers would come out the next morning, empty the bin, and process the payments. In the alternative, the title company agent could choose to wait in line and make the payment in person. However, that could entail a significant wait because "[t]here may be another title company recording that has 300 documents." *Id.* at 17. As soon as the cashier processed a payment, she would assign a liber and page number to each mortgage. The mortgage would then go to the indexing department, where it would be scanned and entered into the computer system. In addition to the liber and page number, the computer log contained other information, such as the parties involved and the date and time of recording.

Thierbach was also asked whether, if the title company had wanted to, it could have delivered the mortgage and accomplished recording all in one day. Theirbach stated that this could be done, but it was not possible to simply submit a check for payment and the mortgages at the very

same time. As outlined above, the title company agent would need to perform one or more steps in between. Initially, she explained the process as follows:

> Q. Okay. If a title company – well, if Progressive Title Company had wanted to drop off their mortgages, this one was included with the Oakland County Register of Deeds, and have them all recorded and pay the fee on March 24th 2005, could they have done that?
>
> A. Well –
>
> Q. Could they have left a check with the mortgages for the recording fee?
>
> A. Not at the same time they dropped the documents. No.

*Id.* at 24-25.

> However, Theirbach amended her view in the following exchange:

> Q. And again, if Progressive Title Company had dropped off this mortgage with the – in the bin for the validation department, would they have been able to do that and also pay the fee at the same time for the recording?
>
> A. If – yes. There is no reason why they can't take them to the cashier the very same day. We do not tell people they cannot record documents. . . .
>
> Q. Well, I understand that. But if they were to just drop off the mortgage in the bin at the validation department, can they drop off the mortgage with the fee at the same time and leave and have that mortgage recorded?
>
> A. No.
>
> Q. Okay.
>
> A. We do not want them leaving the check when they leave the documents.

*Id.* at 26-27.

> The questioning continued, leading to the following testimony:

> Q. Do they [i.e., title companies] have an option of recording a mortgage in a single day by coming into the office or by getting it there some other way other than in a batch?

A. Sure.

Q. And how would they do that?

A. They can walk into the office and hand-deliver it.

Q. And does it have to be one at a time? Or is there some maximum number that they can deliver that way and have them recorded in the same day?

A. Well, there is no set amount that we ask them to not go over or not ask us to do right away. Depending on what the circumstances are, we listen to what the circumstances are, and then we – even if it's not something we can do in the next 5 to 15 minutes, we would explain to them this is going to take us a half hour to check the locals. Or we're really busy right now, can you just leave them here with us, have a seat, go to the cafeteria, have coffee, whatever, go to lunch, come back in an hour and we'll be done. And then at that point they can take them to the cashier and pay at that time and the documents are recorded right away then.

Q. So in March of 2005 would a title company have been able to walk into your office with 25 mortgages and a check and wait around while you –

A. March of '05?

Q. Yes. While you validated and –

A. It would all depend on how busy we were, if we had a backlog, if there were other title companies that had documents that were waiting to be checked, was our full staff there that day. There were a lot of things taken into consideration. But if someone comes into the office and says this is a rush recording, we hear this all the time, a million dollar deal, I've got to get these on record today, we do that for them.

*Id.* at 34-36.

However, Thierbach reiterated that dropping off a check and a batch of mortgages (or even

a single mortgage) at the same time was not permitted:

Q. But they can leave the mortgages and a check?

A. We don't want the blank checks laying around because – just we don't want to be responsible. What if it falls out of the folder and gets lost. You know, it's a blank check. We are a public office. We're open to the public. If someone found it, you know.

Q. So the Register of Deeds wants to check all the mortgages before they accept payment for the recording fee for the mortgages?

A. Well, just so that there's not blank checks flying all over the office.

Q. I understand. But regardless, even if they were coming in with one mortgage, Register of Deeds would want to check that mortgage first before they would accept tender and payment for the recording fee?

A. Yes.

*Id.* at 40.

On the other hand, the trustee submitted an affidavit by Thierbach given in another case wherein she identified a way in which a person could submit a check and mortgage at the same time. When questioned whether the procedure she described in that affidavit was available from March through June 2005, she stated that it was. In addition to the process outlined in the memo and in-person "rush" processing, Thierbach stated in her affidavit that "documents could have been submitted individually for recording by mail or overnight service, in which case, such documents would have been marked with a received date, would have been processed in order of receipt and returned to the sender after recording, so long as they were in proper form and were accompanied by the proper fee." Pl.'s Objs. to Mot. for Summ. J., Ex. 8, Thierbach Aff at ¶ 9.

As mentioned above, Thierbach seemed to believe that the delay between receipt of the mortgage and ultimate recording was the product of the title company's failure to come back to the register of deeds in a timely manner and submit payment along with the verified mortgage. *See* Thierbach Dep. at 14 ("I believe that it's because the title company representatives did not come back and pick up the documents in a timely amount of time."). However, this is undermined by the evidence that the title company had a check ready for payment on either March 24 or 28, 2005. *See* Pl.'s Objs. to Mot. for Summ. J., Exs. 1-2, Progressive Checks. Unfortunately, that evidence is

compromised somewhat by the unexplained inconsistency of two different copies of the same check. The fact that there are two checks by itself raises a red flag because there was only one payment to be made. Moreover, both copies of the check are from the title company and made payable to the Oakland County register of deeds, and both are written for $4,797.30, the recording fee for the batch of mortgages at issue. However, copy one of the check is dated March 24, 2005, while copy two is dated March 28, 2005. In addition, the month notation on the second check is handwritten; whatever month was originally printed is now indecipherable. Yet both checks bear the same check number. The back of the first check shows that it was deposited on June 22, 2005. The back of the second check, on the other hand, bears two stamps, one indicating that it was received on June 20, 2005 and the other indicating that it was deposited on June 22, 2005. The Court is not sure what to make of all this, and neither was the bankruptcy court. That court only mentioned the check issue in a footnote, observing that the parties "were unable to provide any explanation for these discrepancies." *See* Bank. Ct. Op. at 7 n.1. However, the court found that the illegal practice of the Oakland County register of deeds in refusing to accept payment when recordable instruments were presented excused the need to tender payment, and therefore the court concluded that "any factual issues about the dates on the check are not material, and do not preclude summary judgment." *Ibid.*

Finally, the record contains a written description of the Oakland County register of deeds's recording policy as it was understood by Progressive Title Company employee Denise Jalecki, the agent who handled the mortgage at issue. Although the statement is unsworn, it tends to confirm the idea that the title company was only aware of the procedure outlined in the memorandum. In relevant part, Jalecki writes:

> In regards to getting documents on record with Oakland County, the way it works is, I take a batch of 30 documents and drop them off in a basket. It takes approximately

> a week to get the batch checked. I pick them back up after they have been checked
> over by an Oakland County register of deeds clerk. If they are rejected, I have to
> bring them back to the office, fix them, and drop them back off at OC for another
> week for a recheck. If they are not rejected, they are left in a separate batch with
> either a blank check to be filled out by the clerk, or I would have to fill in the amount
> and leave the check. Sometimes the check is rejected and the batch has to be re
> picked up, fixed and left again.

*See* Pl.'s Objs., Ex. 5, Jalecki Statement. It is not clear from Jalecki's statement whether she has any

knowledge of the circumstances of the specific recording at issue in this case.

Following the bankruptcy petition filed on August 26, 2005, the bankruptcy trustee and

appellant in this matter, Gene Kohut, commenced adversary proceedings on October 18, 2006. *See*

Bankruptcy Dkt. Sht. at 1. Kohut sought to avoid the mortgage as a preferential transfer pursuant

to 11 U.S.C. § 547(b), contending that the mortgage was perfected on June 20, 2005, and thus within

the ninety days preceding the bankruptcy petition. *See* Adversary Compl. at ¶ 12.

Wells Fargo filed a motion for summary judgment on May 2, 2007, contending that the

mortgage should be deemed recorded on March 24, 2005 when it was presented to the Oakland

County register of deeds, although not accompanied by the required filing fee, because the register

of deeds would not have accepted the filing fee had it been offered. The bankruptcy court credited

this theory and granted Wells Fargo's motion on that basis. Kohut subsequently filed this timely

appeal. The Court heard oral argument on December 3, 2007.

## II.

"The district court reviews the bankruptcy court's grant of summary judgment *de novo*." *In

re Lewis*, 398 F.3d 735, 746 (6th Cir. 2005). This Court therefore turns to the same procedural rules

used by the bankruptcy court in adjudicating that motion. *Ibid.* A motion for summary judgment

under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact

for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). It must be emphasized, however, that "[i]n evaluating the evidence, [the court] 'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'" *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) (citation omitted)..

To prevail on a claim of avoidance, the trustee has the burden of satisfying all of the elements of a preferential transfer pursuant to § 547(b) of the Bankruptcy Code. 11 U.S.C. § 547 (g); *In re Southern Air Transport, Inc.*, 511 F.3d 526, 534 (6th Cir. 2007) ("The trustee bears the burden of proving each of the five elements under 11 U.S.C. § 547(b) for a transfer to be avoidable under that section.") (citing *In re Fulgham Constr. Corp.*, 706 F.2d 171, 172 (6th Cir. 1983)). One of those elements is that the transfer to be avoided was "made . . . on or within 90 days before the date of the filing of the petition. 11 U.S.C. § 547(b)(4)(A). Wells Fargo maintained in its motion for summary judgment that the trustee failed to come forward with evidence that the mortgage was recorded – and therefore the security interest was perfected – within the preferential transfer period.

-14-

The bankruptcy court was faced with the task in this case of determining when the Pankey mortgage was recorded where the local county official had abandoned the practice that the state legislature had put in place to determine that very fact. Because the corrupt entry mortgage book provided no help, the parties looked to different aspects of the recording process and seized on discrete features as an indicator of the mortgage record date. For instance, the creditor asserted that the undisputed evidence established that the mortgage was presented in recordable form on March 24, 2005, and therefore it should be deemed recorded as of that date. The trustee argued that the liber and page numbers were assigned and the recording fee paid on June 20, 2005, which should be deemed the record date.

In approaching its task, the lower court first turned for guidance to its own precedent, *In re Schmiel*, 362 B.R. 802 (Bankr. E.D. Mich. 2007), as does this Court. In that case, as in the present matter, the debtors had refinanced their home by obtaining a new mortgage shortly before filing for bankruptcy on September 26, 2003. Closing occurred on April 25, 2003, and the mortgage was delivered to the Oakland County Register of Deeds by a title company employee on April 30, 2005. However, register of deeds "did not make any notation on the mortgage to show the date and time that it was received." *Id.* at 806. The check for the recording fee was dated June 17, 2003, but register of deeds did not deposit the check until July 30, 2003. On that date, ninety-six days after the April 25, 2003 closing, register of deeds stamped the mortgage with a liber and page number. To bring the transfer within the ninety-day period, the trustee argued, as here, that the mortgage was recorded on July 30, 2003, the date the liber and page number were assigned.

The bankruptcy court disagreed with the trustee. After examining Michigan statutory and decisional law, the court held that notation into a mortgage book was a sufficient but not a necessary

condition for proving recordation of a mortgage for the purpose of the race-notice recording statute. *Schmiel*, 362 B.R. at 816 (observing that "just because a register of deeds does not comply with its statutory obligations to maintain an entry book under Mich. Comp. Laws Ann. § 565.24, it does not follow that a document cannot be deemed recorded under Michigan law"; and that "a document *can* be considered as recorded in Michigan even when the register of deeds has failed to perform its statutory duty to make an entry of such document in an entry book as required by Mich. Comp. Laws Ann. § 565.24"). The court reasoned that when the county register of deeds abdicates its statutory responsibility and does not keep a mortgage entry book, the recording date of a mortgage can be determined by the date(s) of completion of three statutory requirements:

> 1. The mortgage must be received by the register of deeds under Mich. Comp. Laws [] § 565.25(1).
>
> 2. The mortgage must meet the technical requirements of Mich. Comp. Laws [] § 565.201.
>
> 3. The recording fee must be paid when the mortgage is left for record, under Mich. Comp. Laws [] § 600.2567(1)(a).
>
> If these three requirements are met, in light of *Central Ceiling* [*& Partition, Inc. v. Department of Commerce*, 249 Mich. App. 438, 642 N.W.2d 397 (2002), *affirmed at* 470 Mich. 877, 683 N.W.2d 142 (2004)], and prior Michigan case law, the Court holds that the Michigan Supreme Court would conclude that a mortgage is deemed recorded, even absent the entry of the mortgage in an entry book by the register of deeds as required by Mich. Comp. Laws [] §§ 565.24 and 565.25.

*Id.* at 817. The court also stated that assignment of a liber and page number is conclusive evidence that a document has been recorded, but recording can occur before the assignment of those numbers. Rather, according to the court's reasoning, a document is "duly recorded" within the meaning of Mich. Comp. Laws § 565.29 when all three statutory requirements have been met. *Id.* at 820

(holding that "recording is deemed to occur at the first moment that all three requirements have been met").

This Court agrees with the reasoning of the bankruptcy court in *Schmiel*, finds it to be a sensible and accurate gloss on Michigan statutory law governing the recording of documents affecting an interest in real property, and adopts the reasoning as its own. The uncontested record establishes, as the bankruptcy court found in this case, that the Pankey mortgage was presented to the register of deeds in recordable form on March 24, 2005. The date the recording fee was paid is the subject of a factual dispute, however. And that factual dispute precludes summary judgment. *Burkart v. Post-Browning, Inc.*, 859 F.2d 1245, 1249 (6th Cir. 1988) (holding that "summary judgment may not be granted unless there are no remaining material facts in dispute").

The bankruptcy court held that the factual dispute was not material on the theory that the creditor in this case was excused from paying the recording fee because there was some evidence that the register of deeds would have refused to accept payment if it were tendered, and Michigan law does not require a person to engage in a "useless formality." Bank. Ct. Op. at 6-7. The court did not address the question when payment of the recording fee actually was made in this case. Instead, the court found that the creditor had offered evidence that Oakland County officials would not accept payment of recording fees at the time title companies presented a batch of documents for recording, and it held that "the policy of the Oakland County Register of Deeds excused Wells Fargo from making payment on March 24, 2005, when it submitted this mortgage, as any such tender of payment would have been futile." *Id.* at 7.

The Court disagrees with that reasoning on several grounds. First, as the *Schmiel* court observed, one of the three essential features required by Michigan law for a proper recordation of

an instrument affecting an interest in real estate is payment of the recording fee. *Schmiel*, 362 B.R. at 817. The Michigan statute states simply: "The fee shall be paid when the deed, mortgage, certified copy of an attachment, notice of the pendency of a suit, or other instrument is left for record." Mich. Comp. Laws § 600.2567(1)(a). The lower court stated that there is no statutory authority permitting a county register of deeds to refuse payment of a recording fee, and that, no doubt, is true. But the *Schmiel* court correctly concluded that "if a mortgage is delivered to a register of deeds and is in compliance with [the statutory technical requirements], but the statutory fee is not then paid, then the mortgage is not recorded at that moment because Mich. Comp. Laws [] § 600.2567(1)(a) has not been met." *Schmiel*, 362 B.R. at 819. That court anticipated the very problem presented in this case when it observed that "the failure or the refusal of a register of deeds to accept payment of a recording fee when a mortgage in recordable form is delivered, whether accomplished by refusing to accept a check, returning a check, or delaying negotiation of a check, should not result in a mortgage left for record not being deemed recorded any more than the failure of a register of deeds to maintain an entry book should cause such result." *Id.* at 819 n.5. All of that is true as well. But it does not alter the statutory obligation of the person seeking to record a document to pay the recording fee at some point in time. Under Michigan law, the burden of complying with the recording statutes rests with the recording party. *Barnard v. Campau*, 29 Mich. 162, 162, (1874) ("In general it will not be disputed that one who seeks a benefit from the recording laws must incur all risks of the failure to put his papers duly upon record, whether the fault shall be his own or that of an officer.").

Second, the bankruptcy court's reliance on *Hanesworth v. Hendrickson*, 320 Mich. 577, 31 N.W. 2d 726 (1948), for the proposition that a party need not tender payment when it is likely to be

refused is misplaced. *Hanesworth* involved a suit for specific performance of a contract for the sale of real estate. The purchaser paid over a deposit, but the trial court found as a fact that before the closing the seller made it clear that he would refuse to convey the land. The court held that in those circumstances, the seller was not obliged to tender the balance of the purchase price in order to preserve his right to specific performance. That holding is based on the well-accepted contract doctrine of anticipatory repudiation. *See Eaton Corp. v. Easton Assocs., Inc.*, 728 F.2d 285, 291 (6ht Cir. 1984) (observing that "*Hanesworth* presents a classic case of anticipatory breach of a land sale contract. In the case of anticipatory breach of a contract of sale plaintiff is not required to tender performance in order to bring suit on the contract") (citing 4 Corbin on Contracts § 959 (1979)). The Michigan Supreme Court has held that when statutory duties are involved, compliance with payment provisions are mandatory, and a "willingness to tender payment [is] not sufficient." *Flynn v. Korneffel*, 451 Mich. 186, 203, 547 N.W.2d 249, 256 (1996) (interpreting statutes governing redemption of forfeited land contracts).

Third, it is not altogether clear that the Oakland County Register of Deeds would have refused payment of the recording fees under all circumstances. There is little doubt that simultaneous payment was discouraged when title companies sought to record large batches of documents, and that the Oakland County officials had invented an extra-statutory procedure for processing payments in those cases. But the trustee offered evidence that the register of deeds occasionally did accept payment of recording fees in accordance with her statutory obligation, that is, when the documents were presented and payment was tendered. For instance, deputy register of deeds Laura Thierbach filed an affidavit stating that the title company could have walked in the mortgage and asked for "rush" recording or sent the mortgage by mail along with a check. Wells

Fargo argues that the Court should not consider Thierbach's affidavit because it was given in another case. It is beyond dispute that this Court should not consider evidence missing from the record below when engaging in appellate review. *See, e.g., Brown v. Marshall*, 704 F.2d 333, 334 (6th Cir. 1983). However, this rule does not apply to the present matter because, although Thierbach's affidavit originated in another case, it was made a part of the record before the bankruptcy court in the present matter. The affidavit is sufficient to raise a question of fact whether the payment would have been refused. Even in *Hanesworth* and the cases upon which it relies, there was a finding of fact at trial or by party admission that performance would have been refused regardless of any attempt at tender of payment.

Fourth, the ultimate fact question in this case – when was payment made – remains unresolved on this record. The trustee insists that the question is answered conclusively by evidence of the date the check was negotiated by the register of deeds. However, the creditor's obligation under the recording statute – Mich. Comp. Laws § 600.2567(1)(a) – is to *make* the payment, not have it accepted. Evidence of check negotiation certainly is relevant to the determination of when the payment was "made," but it by no means is conclusive. If a creditor presents to the register of deeds its mortgage in recordable form and makes payment of the recording fees, it has completed all three steps required for recording the mortgage, even if the payment is refused. *See Schmiel*, 362 B.R. at 819 n.5. There is evidence that the recording fee check was written on March 24 or 28, 2005, but that is not conclusive evidence of when the payment was made, either. The title company may seek to establish the date payment was presented to the register of deeds by evidence of its routine practice, *see* Fed. R. Evid. 406, but on this record, the fact issue cannot be resolved as a

matter of law.  After all, the inferences yielded by these sketchy facts must be viewed "in a light most favorable to the non-moving party.'" *Rodgers*, 344 F.3d at 595.

The Court concludes, therefore, that the bankruptcy court's determination as a matter of law that the Pankey mortgage was "duly recorded" outside the preference period was erroneous.

## III.

The Court finds that the bankruptcy court's order granting the motion for summary judgment filed by Wells Fargo Bank, N.A. and New Century Mortgage Corporation was erroneous.  Fact questions preclude summary judgment in this case.

Accordingly, the judgment of the bankruptcy court is **REVERSED**, and the case is **REMANDED** for further proceedings.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   August 21, 2008

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 21, 2008.

s/Felicia M. Moses
FELICIA M. MOSES

---